Court of Appeals. We have four cases to be submitted today on oral argument. We'll hear the first two and then take a brief recess and then finish with the final two cases. And we begin with Bolton v. United States. Ms. Holmes? May it please the Court, Your Honors, Counsel Opposite, my name is Mary Lee Holmes and it's both a pleasure and an honor to stand here before you. This is my first time to argue in the Fifth Circuit. Myself and my partner, Corey Perez, represent the appellants Charles and Linda Bolton. Charles Bolton is a former Chief Deputy of Forest County Sheriff's Department who proudly and honorably served our community for over 40 years. Linda Bolton, an equally proud citizen, is his wife. A federal grand jury in Jax, Mississippi, was empaneled to thoroughly investigate allegations of food theft of the Boltons. After thoroughly investigating the matter, including calling numerous witnesses, the federal grand jury failed to charge the Boltons. As a result, the Boltons have never been given an opportunity to face their accusers. When you say failed to charge, I was confused in this by the briefs. You're just saying they didn't charge them with that offense or that the government actually asked for it and they returned a no bill? I tried to subpoena the matters. My understanding is that there was a no bill. I just know that they weren't charged with anything related to food theft after several, bringing it to the grand jury and several different witnesses coming before them. But at sentencing, the district court found that jail food theft was relevant conduct. Is that right? Yes, Your Honor. That was found to be relevant conduct, which these agents in this matter were aware that the preponderance of the evidence standard is far different than what they presented to the media as if they were tried and convicted on food theft, as if they actually had an opportunity to face their accusers. What were they convicted of? I'm sorry, Your Honor? What were they convicted of? They were convicted of tax evasion and related to cashing checks for a friend of theirs, which is now being contested, where it's an attorney friend of his that's now come in and said that he's blaming it off on an accountant who's also now been charged with different federal invasion type crimes. The tax evasion was based on their, on the fact that they stole food? No, Your Honor. What was it based on? It was based on where Mr. Bolton had, as a favor to a friend, would cash different checks for him, and he'd bring the cash directly back to him. Unbeknownst to him, John Lee, the attorney, was actually going and writing this off against the Boltons, and they didn't know it. And then there's a separate part to it is where Linda Bolton, on her accounting, she's not a very educated person. She would write loan next to different transactions, and the accountants never came into question, well, what do you mean by loan? And what she meant is that I've already been taxed for this. It's not for sales tax. And so, but it had nothing to do with food theft at all. But how can it be problematic for a federal agent to talk about something that a federal judge found in a criminal case? I mean, it's a court finding. Well, it was a finding of preponderance of the evidence. They represented. Right. Totally went rogue. Why does that matter? I'm sorry, Your Honor? Why does that matter? I mean, it was a court finding that they engaged in this theft. Well, what they told the public is that they were found of stealing $700,000 worth of food, and that was absolutely not a finding of the court. There was no numbers of that sort. It doesn't even make any sense. So they went rogue on something that they were not able to return an indictment on, and from what I believe, and it would be my opinion, but while we're asking the court for discovery. Okay, so even if they did say some things that weren't supportable, the real question is whether it was outside the scope of their employment. I mean, isn't talking to the press is something that the head of a regional FBI office is supposed to do? Well, they're allowed to talk to the press, but it's never authorized to be able to talk about uncharged conduct, which there's no charge of $700,000 for the food being stolen. There's no charges as to what they alleged to the public that they were tried and convicted of. And it entirely misrepresents, and that's the only – it's a stain of public opinion that can never be washed away. This is something that was totally rogue. What's your best case? I mean, just because even assuming they violated policy, what's your best case for saying a federal agent or a federal prosecutor talking about a case to the media is outside the scope of their employment? Your Honor, I don't have a good case on that. That's why I referred back to our Senate judicial hearings. They've gone on to say how it's uncharged conduct that they're going on to talk about, which they were absolutely aware of for their own political motives. Comey, that policy was talking about uncharged individuals. That's why Comey was criticized, uncharged individuals. Here, your client is both charged and convicted of a crime. But not convicted of stealing food. You think Comey was acting outside the scope of his employment? He was going for personal gain and personal motives, which we found to be that that's where he was going. And that's why we're asking for a Stokes case is what I'm relying on to say that we're entitled to discovery on this matter where we can show that what we've alleged in our facts that these were people that had specific knowledge that what they were seeking to get an indictment on they were unable to do. And if they had this kind of information, they would have been indicted on it. But instead, the Boltons are just charged by public opinion in what they went totally rogue. So what they used talking about, you know, the government and these agents come out and try to explain these interviews away by saying that we're explaining the convictions. But if you look at the actual interview, they're just talking about this charge of public corruption, which is something that the U.S. attorney who really rubber stamped this case to get a certificate claiming they acted within their scope of employment. That's the same U.S. attorney who was unable to get these indictments. Charles Bolton is a very public figure that is very well liked and very. Was he the jailer? He was over the jail. Yes, your honor. He was the deputy chief of the of the sheriff's department. Deputy chief in charge of the jail. Yes, your honor. But this was not nothing was ever even pointed to anything or even evidence introduced in the trial relating to the theft of the food. No, your honor. So this completely came out in relevant conduct. Talking about that, the Baltans stood up and tried to defend the best they could and explain that we have nothing. We bring one person forward who says we've been as much as stole a biscuit. They haven't done that. These were people hiding behind some sheet. There's CIC one. No one's ever been able to confront these witnesses. And this is the U.S. attorney's office's press release after the sentencing said and the district court found they stole food. So the sentence was increased based on that. Would would you be able to sue the person who drafted that press release? When I'm sorry, can you state that, your honor? Typically, after a sentencing in a big case, the U.S. attorney's office sends out a press release. I mean, part of the reason we have criminal law enforcement is deterrence. So that's why the DOJ wants to publicize these things. So let's say one probably did issue if a press release issued after your client's sentencing that in the press release, it said. And the court found that they stole food and that influenced their sentence. Would you be able to sue the person who drafted that press release? Not if they actually cited verbatim of what the court actually found and where the court explained that they found a culture of corruption. It was not pinpointed that they actually stole food. It was came out as relevant conduct because of some allegations in a PSR, which I still argue was influenced by their motives. There were FBI agent was removed off the case because Charles Bolton was a part of having an illegal alien that was being harbored, being picked up. There's a different motives that are here in the personal game that they got by going rogue to say we've now uncovered this public corruption. This is what U.S. attorney Michael Hirsch was running on a public corruption campaign and unsuccessfully at his bid for the attorney general's office. Then they came back and now he's certified that they acted within their scope when they knew they could not get the indictment. You had a sentencing hearing, I assume. Yes, Your Honor. And at the sentencing hearing, I assume that the theft of the food was an issue that was discussed. Is that correct? Yes, Your Honor. And did your clients deny it at that time? Yes, Your Honor. They denied it in every way they could and asked to know who it is that you were claiming is making these allegations. All right. Now, was the sentence appealed? Yes, Your Honor. And this court affirmed it? Yes, Your Honor. And I, unfortunately, was not one of the attorneys arguing it, so I don't think it was something, you know, I think that it's something that could have been argued, certainly. But I don't know to what extent those other attorneys did argue it, but it was affirmed. And I assume that the government put on evidence at the sentencing hearing that these defendants had stolen food from the jail. They put on a PSR, but they wouldn't identify anybody that made these statements. Only the PSR. Yes, Your Honor. And we weren't privy to any of the 302 report that actually claims where these people came from, which it doesn't make sense or it doesn't seem logical that if you had this kind of information, I mean, we know that there's the power of agreeing jury to indict, and they didn't have enough to even indict them. But then it can be used as relevant conduct. I mean, but they were not able to challenge that. The $145,000 that they're required to repay, what was that based upon? That was based on the cash checks from John Lee. That's the substantial part. Then there's the other part that was not calculated right by the tax accountants who did not understand what Ms. Bolton's notations meant of when she put loan because they had already turned in their 1099s and expect the 1099s are going to be properly accounted for. They're just lay people that are signing their own tax returns. But that's what accounts for that $145,000. In the $145,000, there was $28,000 that was added because of food theft, and that was because of the relevant conduct, which they tried to come back and rebut. But how do you rebut people that are standing behind a door that you can't even face your accusers? And, Your Honor, I'd like to, if I could, if there's no further— Your time has expired, Ms. Holmes. Yes. And we appreciate the fact that it's your first time to appear before the court. You've done a nice job and hope you'll be back. Thank you, Your Honor. All right, sir. I'm going to let you pronounce your name because I'm sure I'm going to mess it up, so. Corey Perez. Perez? Yes, Your Honor. All right. Bye, Mr. Perez. May it please the court. Your Honors, again, Corey Perez representing the appellants, Charles and Linda Bolton. I did want to follow back up with a few questions that were posed to my co-counsel, and specifically whether or not the judicial determinations from a judge about relevant conduct provide a basis for these agents to go and then make uncertain claims about uncharged conduct. And they do not. And the reason is— Let's agree, let's say assume we agree they do not. We've sort of been avoiding the main issue, which is not whether they had a basis to make these comments, but whether the comments were in the course of their employment. I mean, even if they were completely false, isn't the test just whether this is something that is part of their job duties within their normal duties, even if they engaged in wrongdoing? Yes, that is the test. However, even if media contact or media press releases, as Your Honor used an example before, were a part of their course and scope, commenting to the media about uncharged conduct, that is the purpose. If you look at the actual interview, it mentioned nothing about the sentencing hearing and the tax evasion or theft or whatever the alleged tax crimes were. The interview was solely focused on food theft. That's all it was. And they did use at the very end a broad statement that the FBI and IRS are here and we will find you if there is corruption. Well, the judge in the sentencing hearing said that there was some form of culture of corruption but never delved into any detail of what that was. And so if the primary motivation is to go in and specifically talk about the uncharged conduct, we know, which is why we provided supplemental briefing to the court, which we believe was improperly denied and not considered, that public policy dictates that the court, in an overwhelming amount of legislative action, that is the hearings that were held, spoke directly to whether or not FBI or the Department of Justice may go in and discuss uncharged conduct. That, to me, is the umbrella. That's where they cannot pierce. That is, if they are solely convening a media, some type of press release or interview, they cannot discuss uncharged conduct. It would stop before then because that is the policy of both the Department of Justice and the FBI, which we know, based on testimony, that it's rampant that the FBI agents on all levels, doesn't matter if supervisor over Mississippi or not, violated this policy. And so, yes, they act outside their course and scope when they elect to give a media interview for the sole purpose of discussing uncharged conduct. But that has constitutional implications, too. What did they discuss other than the theft of the food? Your Honor, they discussed the food theft. They did mention the sentencing. And then, as I stated before, the last paragraph of the interview that we provided in our briefing states that the FBI, the IRS are ever present and we will catch you if you – basically it's a PSA announcement at the end. But I saw no mention whatsoever of the actual basis for the conviction of tax-related theft. There was no food theft because just because that judicial determination is made based on a different standard, we believe that it was violation of the confrontation clause of the Sixth Amendment. Because, of course, applicable to the states of the Fourteenth Amendment, you should have a right to confront your accusers and witnesses that are against you. I mean, that goes back to Maddox v. U.S. in 1895, the first major confrontation clause – excuse me – case that was presented. And it's through both legislative acts. It's also through our Constitution and our laws that evidence the importance of public policy when dealing with these type of accusations. And so even if this Court determines that on the face of the pleadings that the appellants have not completely proven that they are outside the course and scope, it's our default position and the alternative that the district court should have grained a discovery. And that is because that Stokes case that co-counsel mentioned earlier specifically provided that you just have to have an arguable or legitimate basis on the face of the pleadings from Rule 8 to be able to get additional discovery on the issue. And so to find out the personal or political narratives or biases that were evident with these agents and officers because they could not get an indictment on this food theft, we must be able to have – or entitled to written and also deposition discovery. It's important because that's how we uncover on the face, further delving into the issue, what those personal and political biases and interests were. And we already know that the own U.S. attorney who could not get the indictments or get the charges or get the convictions also signed the certification, which we're allowed to rebut with discoverable evidence. And on the face of those pleadings, we believe that we've alleged enough to at least allow the appellants to obtain discovery on the issue because the government and specifically government employees who act outside their scope should not enjoy some form of sovereign immunity or blanket immunity, and that's what the case precedent is allowing if it fails to allow discovery. You can still sue the federal government. Yes, Your Honor. I mean, it's not saying you can't bring a suit. Yes, Your Honor, that's true. But it is the plaintiff's decision to pick her venue or his or her venue and the actions she or he decides to pursue. And this is one of the election of the remedies that we sought to pursue. And that's why it's so imperative to get discovery because if the government is substituted and the FTCA is allowed to be the only remedy, there is no remedy for the plaintiffs in this case. So we're not denying that FTCA is not one of the available remedies to the plaintiffs, but the plaintiffs chose and elected to file suit against these individuals because of their personal gain and interest in this case to try and put forth and convict them in the court of public opinion. And unfortunately, that shouldn't be allowed in our country nor based on the Sixth Amendment. And the particular facts of this case, again, warrant either this court to reverse the district court and find that there was enough to prove that they were outside the scope of employment or at least allow discovery. The alleged value of the food that they are charged or that they are accused of having stolen. The agents for the interview quoted some $700,000, which was unsubstantiated. Your Honor, I see my time has expired. That's all right. The $700,000 was for the first time a figure that was brought forth by the FBI and IRS agents in this case. And so we don't know how that figure was calculated because at the time of the sentencing hearing, all you had was a PSR and C-1 and C-2, confidential informant, CI-1 and CI-2, that we are not allowed to question. What was the criminal statute under which they were charged concerning the checks? I'm sorry, Your Honor? What was the criminal statute? I don't know off the top of my head, but I'm happy to provide it to you after these arguments. I just wonder what was the specific crime with which they were charged and convicted. Your Honor, I do not have that right in front of me. I apologize. That's all right. You've saved time for rebuttal, Mr. Ferrez. Thank you. Mr. Phan. May it please the Court. Dennis Phan on behalf of the United States. I only have a few quick points. There's been a robust 114-page sentencing transcript already by the same district judge. And just to follow on a few of Judge Jolly's questions, if you look at page 195 of that sentencing transcript, Judge Jolly, you asked whether or not stolen food was one of the premises of the tax fraud convictions. There were tax evasion and tax fraud convictions. And it was. The sentencing judge said the overall scheme was to defeat taxes, whether it was stealing food and selling it or whether it was just admitting to their accountant that that was money that they had earned. At trial, was the food that is alleged to have been stolen from the jail part of the government's evidence that was admitted to prove the tax charge? There were several trials that had occurred. There were trials of jail employees. And so something that you see in the sentencing transcript is, again, the district judge discussing those findings. It's Mr. Harrelson, I believe, and Mr. Woodland about how they had testified as to the jail food theft. But in any event, this is a finding that the district judge made that was then appealed to this court in both an open public sentencing hearing and then it was affirmed in this court and the Boltons challenged in this court the bases. We've heard the your opponents say that there was no evidence that was introduced with respect to the food theft that they could attack. They didn't know who was making the charge. They didn't know it specifically what the amount of the food was, that this was just charges that the government made in a PSR. And that's correct. That's they're perfectly able to. They were perfectly able to make those challenges in their sentencing appeal that the district judge's findings were without any type of basis. Of course, they did. They did. Is that is what they said? True. Is what they said. True. I asked you in my question. I said they said that the government did not put on any evidence other than the PSR with respect to the food. Yeah, I think that did not name individuals with whom the government was relying upon for that charge. And consequently, they had no opportunity to cross examine or understand the charges were being made against them. Is that true or not? Whether or not the government, no, the government did not put on specific witnesses in this particular sentencing. So what they said is true. Yes, to that extent. But that has nothing, I mean, I just want to. It doesn't sound very fair to me. Right. No, I understand where your concern is, though that is separate from the question of whether or not the FBI agents, IRS agents in this case, were acting within the scope of their employment. That's not true either. Because he acted and talked about charges on which they were not convicted. And that the policy of the FBI and the Justice Department is that they should not talk about uncharged crimes. And that that's what primarily their argument was. Their argument is they had an aggressive United States attorney who was making public statements about public corruption. He comes down to the Forrest County Jail and he's trying to prove this public corruption with respect to stolen food. And the jury, the grand jury does not indict him. He is not, they are not convicted for it. Yet that's the entire subject of the FBI's public statements. Now that seems to me edging up what is permissible and what is not permissible in terms of their authority to speak. So I have a couple of responses to that. You know, number one is they point to various prohibitions against talking about uncharged conduct. I really don't think that those are the types of policies that are at issue here. Because what you have at issue here— You admit the policies that they stated then. No, I don't. How did he misstate the policy? I'm not sure what policy that they are specifically— So you don't know. You're not denying that there's such a policy. You're not admitting there's such a policy. But he has represented as an officer of this court that that is the policy. So I think we have to accept it unless you can tell us otherwise. And so, you know, right. So first, you know, there's a couple of responses. So the first is that they haven't pointed to any policy about talking about judicial findings that were made in open court. And there's no policy that says if a judge makes a finding in a district court that FBI or IRS agents or any other federal official isn't able to talk about a judicial finding. That judicial finding might be wrong. That judicial finding might be seriously wrong. Did the FBI say—and this may or may not be relevant, probably not relevant, whether they spoke the truth or not— but did they say that they were convicted of stealing food? I don't believe that they did. I think this is pages 22 to 23 of the record where it's the article that shows what they had is. They did say that they, in fact, did steal food. I don't think they said that was the conviction. In fact, the third paragraph in that article talks about how this was about the sentencing of the Boltons. I don't know whether they made their statement. Was the statement of the FBI about the other people that had been convicted in this same criminal trial that you mentioned? It was a matter of corruption in the entire trial. Other people were involved in it. Did they make any kind of statement about the other convictions other than the ones of the plaintiffs here?  But if I can point you to the article that does show up on page 22 and 23, they did make several other statements that I think my counsel on the other side doesn't completely accurately point out, which is they talk about how they went about investigating the Boltons. They talked about how much hard work that was. They talked about what the FBI and the IRS's missions were. They talked about how it took weeks and months of combing through paper records to uncover the type of conduct that happened here. Grand jury would not indict them for it, and they were not convicted of it, and it was not a subject of the trial. It was the subject of a sentencing. Everything but except it suggested that the conviction was for stealing food. Is that correct? It was the subject of a public sentencing hearing in which a judge made that finding. And in that circumstance, of course, Federal officials are able to discuss what judges find. If the judge had written this down in a memorandum of opinion, there's no question that Federal officials could have copied and pasted that memorandum of opinion or sent that memorandum of opinion to the media. And so what we have here is far from anything to do with uncharged conduct. The second point I want to make is— It wasn't uncharged conduct in the—it was uncharged conduct except for the sentencing, and I guess that's— Yeah, that— I guess that's a charge of sorts. Yeah, it was—right, that's exactly right. I mean, it was not charged, but it was found, and it was found to be relevant to these particular convictions. And the second point I want to— Was there a no bill? I'm not able to talk about what would have happened in the grand jury, so I can't give you that answer. But what I will say is—my second point— Was there a no bill? I'm happy to have the sort of factual ambiguity out there. But the second point, and kind of going to Judge Costa's question on this, is it doesn't matter for the purpose of the scope of employment whether somebody violated a policy or not. No employer has a policy for employees to go out there and to commit torts or to go defame other people, which is the allegation that has happened here. And that's made very clear by the Mississippi Supreme Court, and if you look at Commercial Bank v. Hearn, this Mississippi Supreme Court there says that the question is not whether you did not follow the instructions of the employer. The question is whether you actually acted to serve your employer's purposes or whether you were serving your purely personal purposes of your own, whether that these—this was the sort of work that you were appointed to do. And there's no question here. My counsel on the other side has conceded that, of course, these two agents were— about uncharged conduct. They say that—well, kind of disentangling that a little bit. Would you concede that if there is a policy that the Justice Department has that their agents and anyone speaking in circumstances here would be speaking in an unauthorized manner if they talked about uncharged conduct that the defendants were, in fact, guilty of? That's what they said. Yeah, that still wouldn't change the scope of employment inquiry. The scope of employment inquiry isn't whether you're doing something unauthorized. You said they were appointed to make these kind of statements as part of their duty. And I'm saying they were not appointed to make those kind of statements if these policies that they have referred to are, in fact— The question is whether this is the type of work that they were appointed to do. And there's no question that discussing criminal matters with the media and with the public are the type of work that they were appointed to do, even if in a particular case you might disagree with how they carried out that particular type of work or you thought that one type of work was authorized and the other was not. The question isn't at a very specific level whether this particular interview was correct or incorrect, whether there were factual misstatements or not. The question is whether giving interviews, and the district court explained this pretty clearly, we think, that the question is whether giving interviews is a duty that these FBI agents have. And there's no question that the FBI and IRS agents have. And there's no question that they gave interviews in which they actually carried out their duties. They talked about the FBI and IRS missions. They talked about how they investigated this particular case. They talked about their continued presence in the state of Mississippi. And all of that just goes to show that even if they said things that the plaintiffs here say are allegedly untrue, that doesn't change the fundamental nature of what they were doing, which was discussing a closed criminal case in which there had been open sentencing hearings about in which they were talking about more broadly the mission of the FBI and the IRS. Isn't it the case that in a sentencing proceeding the district judge can rely on the PSR as presumptively correct? That is to say that it's then up to the defendant to present evidence to disprove what might have been in the PSR? Yeah, right. We don't think there's anything unusual about what the district judge did here at sentencing. And, of course, this Court has not found anything unusual with what the district court judge found at sentencing. And this Court's position- When they objected to it, when they objected, did they offer any county evidence? They did not. I mean, they offered the testimony of the Boltons themselves. The Boltons did, in fact, make statements in their own defenses, Charles. And which was a denial? Which was a denial. And did they support it by any other kind of evidence other than their sworn testimony? Did they not steal food? No, they did not. And the judge rejected those denials. I think that's, at least for Charles, on page 246 of the 6700 record, where the district judge said, you know, I've known you for a while. I don't believe you. I think you actually did engage in this type of jail food theft. They didn't put on any other evidence. And, in fact, that is totally consistent with how this case has been handled as a criminal matter and not as in the civil context. It's also consistent with, as Judge Smith said, every criminal sentencing. I mean, you can get convicted at trial of one drug deal, and then at sentencing the judge says, oh, I'm going to tie you to the last three years of all these trucks of drugs coming across the border. And if the judge finds that, that's going to influence the sentence. And there's usually no live witnesses or anything like that. And that's exactly what this court essentially said in affirming, which is even if this wasn't relevant conduct in which you needed some more evidence of, you could still consider this as a 3553A factor of the nature and history of the defendant. And every PSR has a long list of, you know, the defendant's nature and history, their so-called rap sheet or whatnot. And so all of that is entirely usual. And the fact that the sentencing judge, after a 114-page transcript, thoroughly considered all the issues and made those findings, and that two FBI and IRS agents then repeated those findings, that doesn't take them outside the scope of their employment. Just to really briefly address the question of discovery in this case, this is a case that is about two federal officials' immunity from suit. And so in those cases, the Supreme Court, as well as other courts of appeals, have made fairly clear that there's not even limited discovery unless you put forward something pretty specific to rebut what the government certification is. And that's to protect their immunity. You don't have, you know, just untethered discovery into what two officials happened to have been thinking on a particular day. You actually have to allege something quite specific. And they haven't alleged any particular purpose that these two individuals could plausibly have even been accomplishing other than to accomplish the missions that they were appointed to do, which was to be the FBI and IRS special agents in charge of Mississippi. Would an FBI special agent in charge's comments to the press ever be outside the scope? Or what would be a scenario where you'd acknowledge it would be outside the scope of their duties? It's really hard to imagine a scenario where they would be. I mean, you know, if you get into, like, a neighborly fight over a fence and you go to your local newspaper and say some bad things about your neighbor, like, even if you're an FBI special agent in charge in Mississippi, and that happens to be in Mississippi, I don't think the arguments would be precisely the same. So, I mean, these are all fairly fact-bound inquiries. And the Mississippi Supreme Court has had sort of four-part tests that you're familiar with that, you know, you kind of consider the time and place, you consider the nature of the work that they're appointed to do, and you consider the purpose. And so if there were purely personal purposes, this wasn't really a matter of the FBI or the IRS's missions. In those circumstances, perhaps you would pull somebody outside the scope. But, of course, that's not what we have in this case, which is two agents after a sentencing hearing discussing those findings with a local media. If this Court doesn't have any other questions, we urge this Court to affirm. Thank you, Mr. Fan. Thank you. Mr. Perez, you've saved some time for rebuttal. Again, Corey Perez for the appellants, Charles and Linda Bolton. Opposing counsel actually made my point even more clear in rebuttal, and that is, for discovery purposes, quoted fact-bound inquiries mandate discovery. I can think of no better scenario in which a large portion of this panel's time has been devoted to discussing facts of a case, in particular, the facts of whether or not the FBI and IRS agents at issue in this case were allowed to speak to uncharged conduct and what the sufficiency of that uncharged conduct was. And we're not only entitled to know the fact-bound inquiries through discovery of what exactly motivated both politically and personally these comments, but the District of Columbia, again, in the Stokes case, I have to disagree with opposing counsel, because in the opinion it says to obtain discovery and an evidentiary hearing. We haven't even discussed that, that we technically should be entitled to after discovery period, that the plaintiff only needed to have alleged sufficient facts that, taken as true, would establish the defendant's actions exceeded the scope of their employment. And so, no, there isn't. You would have had an opportunity, I suppose, to get those policies that you've referred to that prohibited them from talking about uncharged conduct. Is that in the record at all? Yes, Your Honor. As a part of discovery, we would, but just because of the actual citation. You could have before, I mean, asked the Department for those policies. Or if they're public, you could have found them and attached them to your complaint, I guess. Yes, Your Honor. If they were public, however, all we have to rely on is whether or not, based on the testimony of both Inspector General Michael Horowitz or the FBI Christopher Frey in the case, alluded to these policies and procedures were violated, I can tell you as an officer of the court, my personal research and issue that those internal policies and memorandums are not available to the public. In fact, one of the key issues from the testimony is that, and possibly obtained from discovery, is whether or not the FBI or IRS agents would have to provide some sort of memorandum requesting that even the interview was authorized in the first place. Those are relevant discoverable issues that we're entitled to in discovery, and that is one of those things that written discovery would certainly provide us because they would actually have to respond and state whether or not those written policies exist in cooperation with their own inspector general and FBI director at the time in responding to senators. And that's why the evidence in those hearings are so important because they're so overwhelmingly in favor of the appellant's argument in this case that those policies and procedures exist, which means if those policies and procedures exist, then the uncharged conduct interview provided by these agents was in violation of those policies and procedures, and the interview should have never happened to begin with if they were going to discuss, for the majority of the article, which I have in front of me and we included in our pleadings, says, On Your Side Report, Public Corruption in the Pine Belt. That is the title of the article, nothing mentioning tax fraud, but the public corruption aspect of this case was all about the food theft. And for my last even minute, insofar as as of this past week, an article was published in a local media organization that discussed my client, Charles Bolton's early release from prison due to the sentencing reforms for nonviolent offenses, and only mentioned in reference to anything regarding his sentencing, why he was convicted and imprisoned. When you're going way outside the record, we don't need you to do that. Just confine yourself to the record in the case. Yes, Your Honor. And just my last point is because we're talking about the type of work that opposing counsel mentioned, that this is not some per se rule that falls within the scope. Our definition of the type of work involves whether or not they had any permission within the scope of their employment to give the media in the first place about untrusted conduct. And again, we reiterate our need to reverse. Do we know who authorized them to do that? Was it the FBI or the U.S. Attorney that directed them to make this public comment? Good question, Your Honor, and we would find that out in discovery. Thank you. Thank you, Mr. Perez. Your case is under submission. Next case, Ratliff v. Arenzis.